# RECORD IMPOUNDED

### NOT FOR PUBLICATION WITHOUT THE
### APPROVAL OF THE APPELLATE DIVISION

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3884-22

S.G.,

    Plaintiff-Appellant,

v.

D.R.M.,

    Defendant-Respondent.

_____

Argued March 20, 2024 – Decided September 20, 2024

Before Judges Gummer and Walcott-Henderson.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Gloucester County, Docket No. FV-08-1277-23.

Robert M. Bernardo argued the cause for appellant (South Jersey Legal Services, Inc., attorneys; Robert M. Bernardo, Cheryl Turk Waraas and Kenneth M. Goldman, on the brief).

Respondent has not filed a brief.

The opinion of the court was delivered by

WALCOTT-HENDERSON, J.S.C. (temporarily assigned).

Plaintiff S.G.[1] appeals from an April 24, 2023 order dismissing her application for a final restraining order (FRO) against her former paramour, pro se defendant D.R.M., finding that although plaintiff established defendant had committed predicate acts of domestic violence, plaintiff had failed to demonstrate an FRO was required because she was in immediate danger or the FRO was necessary to prevent further abuse. See generally Silver v. Silver, 387 N.J. Super. 112, 128 (2006) (providing standard for issuance of an FRO under the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35). Plaintiff also appeals from a July 28, 2023 order denying her motion for reconsideration. Defendant did not submit a brief on appeal. We reverse.

Plaintiff and defendant dated for approximately seven months. They did not reside together and had no children or property in common. Intending to celebrate her admission to a graduate school, plaintiff picked up defendant from the motel room where he had been living at the time. Plaintiff brought defendant to her home where they celebrated by consuming alcohol and listening to music in the living room. Defendant later assaulted plaintiff, causing her physical injuries.

---

[1] We use initials to protect the confidentiality of the parties pursuant to Rule 1:38-3(d)(3).

The day after the hours-long brutal assault, plaintiff applied for a temporary restraining order (TRO) against defendant, alleging, among other things, defendant had grabbed her by the neck several times and had covered her nose and mouth. Plaintiff also alleged that defendant had threatened to kill her multiple times, had pulled her off the bed onto the floor and then thrown her back on the bed, ripped her wig off, and pulled at her hair. Plaintiff alleged that she was naked for the entire time and that after about four hours, defendant demanded that she take him home to the motel. Plaintiff alleged that the assault continued while defendant was in her car. Plaintiff further alleged defendant excessively and obsessively called her. The TRO was granted on March 9, 2023.

On March 22, 2023, plaintiff amended her complaint seeking the restraining order. Plaintiff's amended complaint contained additional details about the assault, including that defendant had: whipped plaintiff with a string of lights; strangled her; lifted and thrown her by the neck onto the bed, causing her neck to crack; pinned her to the bed, gripping her hair and hitting her head up and down from the bed; licked all over her face; and pried her eyes open and blew aggressively into them. Plaintiff also alleged that she had lost

consciousness several times as a result of the strangling. Plaintiff certified that the information she included in the original and amended complaints was true.

On April 24, 2023, plaintiff and defendant testified before the Family Part judge during their FRO hearing. Plaintiff testified that when they arrived at her home, they "sat at the table for a little bit . . . opened up [their] drinks, and [] were just talking," hanging out and drinking. At some point, however, defendant began to question plaintiff about her male friends, asking when she had last contacted one of them. Plaintiff testified that when she told defendant she had wished the unidentified male friend "happy birthday" one month prior, defendant "got really mad . . . . [a]nd [] tried to snatch [her] phone," before taking the phone and searching through it. Defendant called one of the male contacts from plaintiff's phone, but plaintiff disconnected the call. The parties then consumed additional alcohol.

Plaintiff further testified that she went to the bedroom, changed into an "intimate outfit," and invited defendant into the bedroom where they began "to engage in sexual contact," but then defendant stopped and instead began an hours-long attack, physically assaulting her while she was naked.

Plaintiff explained that defendant had struck her about the face and body, pinned her to the floor and strangled her, covering her mouth, and

4

holding and squeezing her neck. Defendant threatened plaintiff that he was going to kill her. When she was able to get up and retreat into the bathroom, defendant followed her and sprayed water in her face. He ripped her hair piece from her head, causing hair loss, and asked her "why do you have this on?" Plaintiff further testified that when she eventually got out of the bathroom, defendant barricaded her in the bedroom with him, where he tossed plaintiff from the floor to the bed and banged her head against the bed, whipped her with decorative string lights while she was on the floor, and pried open her eyes and blew into them aggressively. Plaintiff identified photographs she had taken the morning after the brutal assault, depicting red marks on her neck, swelling to her face, bruises and rug burns on her arms, and marks on her torso that had been caused by the string lights defendant had used to whip her. Plaintiff also identified a photograph depicting the broken sink in her bathroom, which she alleged defendant had damaged during the assault which took place in the bathroom. The photographs were admitted into evidence.

On cross-examination, plaintiff recalled that the only thing she remembered defendant saying was that he was going to kill her and that she needed to answer his questions about the phone—and her contact with another

man—and that she believed she had answered those questions, "but he [had] said [she] didn't."

The ongoing and varied assaults in the bedroom and bathroom lasted for close to five hours until defendant asked plaintiff to take him home. Plaintiff believes she lost consciousness—maybe more than once—during the lengthy time defendant had barricaded her in the bedroom with him.

Hours after the assault began, defendant asked plaintiff to take him back to the motel, and she agreed. Plaintiff testified that as she was getting into the driver's seat of her vehicle to drive defendant to the motel, defendant pulled her out and climbed over the driver's seat before sitting in the passenger seat Plaintiff drove defendant back to the motel. When they arrived, defendant refused to get out of the car. For about another hour in the car, defendant shouted at her and grabbed her. Defendant took plaintiff's glasses from her, squeezing them until a lens popped out, and punched the car ceiling and dashboard, ripping the skin on his knuckles and leaving blood marks on the ceiling. Defendant eventually exited the car.

Plaintiff testified that she went to the hospital the next day. Plaintiff had taken photographs of her injuries which were admitted in evidence at the FRO hearing. Plaintiff testified that she was "fearful of the future and [her] life, if

6

[defendant] would have contact with [her]." She noted "the threat that he made" to kill her, claiming she felt "that his actions [we]re unpredictable." She also expressed concern for her "small children."

Defendant testified that plaintiff had picked him up and taken him back to her house after stopping at a liquor store. At the house, they both consumed alcohol and talked, eventually discussing her contact with a male friend. According to defendant, earlier that day, he was "just stressed out from [his] job, because [he] was being racially profiled, [and] racially harassed at work." Defendant further explained that at the time he was staying with a coworker and "there [were] a lot of things . . . said to [him] that upset [him]," and other people living in the motel had a lot of "like weapons and everything on the table" that made him feel unsafe. Defendant admitted that he called out of work on March 8, 2023—the day of the assault—and made plans to meet up with plaintiff. Defendant admitted that he had smoked marijuana and was high prior to consuming alcohol with plaintiff. He testified that plaintiff had initially allowed him to look at her phone and that he became angry when she tried to hide the phone. Defendant admitted that he had snatched the phone from plaintiff and called a number via Facebook, and that a "guy [] answered

the phone. . . . [a]nd before [he] could even get a word in, [plaintiff] snatched the phone, so quickly and hung up the phone."

Defendant also testified that plaintiff had gone to the bathroom to change and came back out wearing "panties and a black like tank top, halter top, or something . . . [a]nd that's when she started to come onto [him]." Defendant testified that he had not had sexual intercourse with plaintiff, but "that's pretty much like all [he] remember[ed] about . . . the situation."

Defendant testified that on the car ride back to the motel from plaintiff's home, he was frustrated because he was talking to plaintiff, telling her that he did not want their relationship to end and that he wanted to work it out. He admitted that during the car ride, plaintiff's glasses "had kind of fell towards [his] left foot" and when he picked them up to give them to plaintiff, she had tried to take them from him and that's when "she said the lens or something popped out." Defendant admitted that he had punched the top of the roof of the car out of frustration, injuring his hands and drawing blood, which dripped down from his hand.

In an oral decision, the court found plaintiff's testimony regarding the assault credible and concluded plaintiff had established that defendant had committed the following predicate acts of domestic violence enumerated in the

PDVA:  assault, terroristic threats, false imprisonment, criminal mischief, and harassment.  <u>See</u> N.J.S.A.  2C:25-19(3)(a)(2), (3), (6), (10), and (13).  The court did not find the predicate act of sexual assault because plaintiff did not "testify that there was sexual contact against her will."

The court denied the FRO, finding plaintiff had not established defendant would continue to have contact with her and, consequently, had not established a need for protection going forward.  The court found significant that

> at no time during her testimony did . . . [plaintiff] testif[y] that there was any history of [d]omestic [v]iolence.  And she said it very calmly as she testified.  There is no evidence in her demeanor or her body language that indicated that she had any fear whatsoever of the defendant.  She was not upset at any time during her testimony, or didn't even appear nervous.

The court addressed the applicable statutory factors under N.J.S.A. 2C:25-29 for determining the necessity of the FRO, stating:

> I've considered that this is a serious [a]ct of [d]omestic [v]iolence that occurred and committed by the defendant.  But <u>Silver v[.] Silver</u> requires that the plaintiff also prove[] a need for protection going forward.  The only evidence for the need for protection going forward is the plaintiff's testimony that she's afraid of the defendant.  Of course, she's afraid of the defendant after what occurred.

9

The court concluded:

> [T]here is a lack of evidence that the defendant will continue to try [to] have contact with the plaintiff in the future . . . . The parties were in a seven-month relationship. They do not have any children in common. They don't own property in common. There's no history of [d]omestic [v]iolence in this case . . . . There's no evidence of a history of the defendant having contact with the plaintiff after being told not to.

In considering the statutory factors under N.J.S.A. 2C:25-29(13)(a), the court addressed factor one, finding that there was no previous history of domestic violence. Of the six factors, the court determined that factors two and four were relevant: "the existence of immediate danger to person or property," and the best interest of the victim. As to factor two, the court stated, "I see no evidence of immediate danger, at this time." The court further stated "that the act of [d]omestic [v]iolence occurred on March 8th, 202[3]. The [r]estraining [o]rder was obtained on March 22nd, where there's no testimony about any attempt by the defendant to contact the plaintiff after the incident that occurred on March 8th." In considering the fourth factor—the best interest of the victim—the court concluded that it "saw no reasons why [plaintiff] would need to continue to have any contact with the defendant." In

10

an April 24, 2023 order, the court denied the FRO and dismissed the complaint and the TRO.

Plaintiff moved under <u>Rule</u> 4:49-2 for reconsideration of the denial of her application for the FRO, arguing that "any one of the acts of domestic violence – of egregious domestic violence that were committed against [her] would have been sufficient enough for the FRO in and of themselves." Plaintiff asserts that she was scared and currently fears the defendant because of the brutal assault and the fact that he knows where she lives. Defendant, although served with the motion for reconsideration, did not file a responsive brief or appear for the hearing.

In a July 28, 2023 order, the court denied plaintiff's motion for reconsideration, finding no error in its decision denying the FRO essentially for the same reasons stated in its oral opinion. The court found the parties did not have any need for future contact with each other, they had no children or property in common and no dependency on one another, and there was a lack of any evidence of a history of domestic violence between the parties. Plaintiff moved for a stay of the court's denial of the FRO, which was also denied. The court stated,

> [t]here's nothing in the papers about any contact by the
> defendant, to the plaintiff, since the entry -- since the

hearing back in April. Which might be relevant to whether a stay should be granted. And -- so without sufficient evidence . . . . I find that it would be inappropriate to reinstate a temporary order that had already been adjudicated.

Plaintiff appealed from the orders denying the FRO and the motion for reconsideration. Plaintiff then moved for a stay of the court's order denying the FRO. On October 12, 2023, we granted plaintiff's motion for a stay.

Plaintiff argues the court erred as a matter of law in finding that the commission of multiple predicate acts of domestic violence did not establish the need for a FRO. Additionally, plaintiff maintains that the court also "erroneously read the amended TRO date as the initial TRO date and reasoned that because the defendant had not been in contact with [plaintiff] between March 9, 2023 and March 22, 2023, [plaintiff] did not need protection."

Our review of an FRO is generally limited. C.C. v. J.A.H., 463 N.J. Super. 419, 428 (App. Div. 2020). In matters involving domestic violence, our Supreme Court has held the findings of a trial court "are binding on appeal when supported by adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 411-12 (1998) (citing Rova Farms Resort, Inc. v. Inv'rs. Ins. Co., 65 N.J. 474, 484 (1974)). "Appellate courts accord particular deference to the Family Part because of its 'special jurisdiction and expertise'

12

in family matters." Harte v. Hand, 433 N.J. Super. 457, 461 (App. Div. 2013) (quoting Cesare, 154 N.J. at 412-13). Deference is further justified because "the trial judge 'hears the case, sees and observes the witnesses, and hears them testify,' affording it 'a better perspective than a reviewing court in evaluating the veracity of a witness.'" Gnall v. Gnall, 222 N.J. 414, 428 (2015) (quoting Cesare, 154 N.J. at 412). However, "a judge's purely legal decisions are subject to . . . de novo review." C.C., 463 N.J. Super. at 429; see also H.E.S. v. J.C.S., 175 N.J. 309, 329-31 (2003).

The entry of an FRO under the PDVA requires the trial court to make certain findings, pursuant to a two-prong analysis. See Silver, 387 N.J. Super. at 125-27. Initially, the court "must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19(a) has occurred." Id. at 125.

Once a court finds a predicate act under N.J.S.A. 2C:29-19(a) occurred, "the judge must determine whether a restraining order is necessary to protect the plaintiff from future danger or threats of violence." D.M.R., 467 N.J. Super. at 322. This determination must be made based on a totality-of-the-circumstances analysis. Silver, 387 N.J. Super. at 126-27; see also N.J.S.A. 2C:25-29(b) (stating "the court shall grant any relief necessary to prevent

13

further abuse"). The inquiry is necessarily fact specific, <u>Silver</u>, 387 N.J. Super. at 127-28, requiring consideration of the following factors under N.J.S.A. 2C:25-29(a):

> (1) The previous history of domestic violence between the plaintiff and defendant, including threats, harassment and physical abuse;
>
> (2) The existence of immediate danger to person or property;
>
> (3) The financial circumstances of the plaintiff and defendant;
>
> (4) The best interests of the victim and any child;
>
> (5) In determining custody and parenting time the protection of the victim's safety; and
>
> (6) The existence of a verifiable order of protection from another jurisdiction.
>
> [N.J.S.A. 2C:25-29(a)(1)-(6).]

Because the judge found defendant had committed predicate acts against plaintiff, defendant has not offered any challenge to that finding, and we are satisfied the finding is supported by substantial credible evidence, the primary issue presented on appeal is whether the court erred in denying the FRO based on its determination that plaintiff had not established the second prong of <u>Silver</u> – the FRO was necessary to protect her from "immediate danger or

14

further acts of domestic violence," 387 N.J. Super. at 128 – because she had not demonstrated "a need for protection going forward."

In addressing this issue, we consider that "[a]lthough this second determination . . . is most often perfunctory and self-evident, the guiding standard is whether a restraining order is necessary, upon an evaluation of the factors set forth in N.J.S.A. 2C:25–29[(a)(1)-(6)], to protect the victim from an immediate danger or to prevent further abuse." N.T.B. v. D.D.B., 442 N.J. Super. 205, 223 (App. Div. 2015) (quoting Silver, 387 N.J. Super. at 127).

In A.M.C. v. P.B., we held:

> [w]hen the predicate act is an offense that inherently involves the use of physical force and violence, the decision to issue an FRO "is most often perfunctory and self-evident." But even when the predicate act does not involve physical violence, the trial court must still evaluate the factors in N.J.S.A. 2C:25–29 a-(1) to -(6) to determine whether an FRO is warranted to protect the victim from an immediate danger or to prevent further abuse.
>
> [447 N.J. Super. 402, 417 (App. Div. 2016) (quoting Silver, 387 N.J. Super. at 127).]

We also considered whether a court may "properly refuse to issue restraints" despite "finding that a defendant committed one of the predicate acts listed in N.J.S.A. 2C:25-19(a)." Id. at 414. Citing A.M.C., plaintiff argues that "when the predicate act is an offense that inherently involves the

15

use of physical force and violence, the decision to issue an FRO is 'most often perfunctory and self-evident.'" Id. at 417 (quoting Silver, 387 N.J. Super. at 127).

In A.M.C., a Family Part judge denied the plaintiff-wife an FRO even though the judge found that her "husband . . . physically assaulted her on two separate occasions over a three-week period." Id. at 405. The judge determined an FRO was not necessary because plaintiff had "'failed to establish even a mere likelihood that the parties would continue to interact in the future' or that [the] defendant posed a threat to her." Id. The judge noted the relatively short duration of the marriage, the fact that the parties had no children and would not be "interacting as parents," and that plaintiff failed to prove all but two incidents of domestic violence, despite alleging many, mitigated against the need for an FRO. Id. at 411-12. We rejected the judge's finding that the absence of children or the duration of marriage were reliable indicators of defendant's future conduct, id. at 416, and held that courts may consider two key factors: "(1) a lack of evidence demonstrating a history of domestic violence or abuse; and (2) the commission of a predicate act that does not involve physical violence against the victim." Id. at 414.

A-3884-22

We examined a similar issue in two other cases. In McGowan v. O'Rourke, we concluded that a single act, without domestic-violence history between the parties, warranted issuance of an FRO because the defendant had "mail[ed] graphic pornographic pictures [of plaintiff] to [her sister] and impl[ied] that they may be sent to [plaintiff]'s workplace and her son." 391 N.J. Super. 502, 506 (App. Div. 2007). And, in C.C. v. J.A.H., we rejected the defendant's argument that an FRO was not necessary to protect plaintiff because there was no history of domestic violence. 463 N.J. Super. at 435-36. In that case, the parties had engaged in mostly a texting relationship after meeting at a gym. When the plaintiff rebuffed the defendant's attempts to meet up in-person outside of the gym, the defendant sent the plaintiff "a barrage" of "vulgar, insulting, and threatening" text messages over approximately twelve hours and the plaintiff sought a restraining order after receiving a text message from the defendant showing her address. Id. at 426. Although in that case we primarily considered–whether the parties had a "dating relationship"—given that the parties had never gone on a date in-person—we also addressed whether the absence of any prior history of domestic violence precluded the plaintiff from obtaining a FRO. Id. at 430.

A-3884-22

We concluded that the parties' relationship was a "dating relationship" under the PDVA and further that the plaintiff's fear that the defendant had found out where she lived combined with his offensive text messages was sufficient to support the Family Part judge's decision that the defendant's conduct had placed the plaintiff in fear and that the FRO was thus "necessary to protect plaintiff from immediate danger or future abuse." Id. at 435-36; see N.J.S.A. 2C:25-29(b); Silver, 387 N.J. Super. at 127.

Our review of this record convinces us that plaintiff demonstrated the need for a FRO to protect her from immediate danger or to prevent further abuse. We reach this determination based on the evidence in the record demonstrating, first and foremost, the brutal and violent assault defendant perpetrated on plaintiff. See Cesare, 154 N.J. at 402 ("[O]ne sufficiently egregious action [can] constitute domestic violence under the Act, even with no history of abuse between the parties . . . ."). "The need for an order of protection upon the commission of a predicate act of 'domestic violence' . . . may arise even in the absence of a pattern where there is 'one sufficiently egregious action.'" Silver, 387 N.J. Super. at 128.

Here, after plaintiff brought defendant to her home and while they were drinking and talking, defendant became enraged because plaintiff admitted that

18

she had texted another man. That disclosure by plaintiff provided the impetus for defendant's hours-long brutal physical assault of plaintiff during which defendant threw plaintiff on the bed and onto the floor, pinned her down, strangled her, caused her to lose consciousness, ripped off her hairpiece, pulled her hair, and whipped her. Defendant also barricaded plaintiff in her bedroom for hours and damaged the sink in her bathroom. And, even after plaintiff agreed to take defendant back to his motel, the abusive conduct continued in her car where defendant berated plaintiff, broke her glasses, and damaged the interior of her car by striking the roof of her car with his fist, leaving blood.

Even though this assault on plaintiff was a one-time occurrence, the violence exhibited by defendant is demonstrative of defendant's efforts to threaten, intimidate, scare, physically and emotionally harm, and demean plaintiff. This conduct constitutes the classic efforts at control that the PDVA was designed to address and prevent. See N.J.S.A. 2C:25-19; Cesare, 154 N.J. at 397.

Moreover, in considering the statutory factors under the second prong of Silver, we are persuaded the court erred in its conclusion that plaintiff did not establish a need for protection. In addressing factor one—the prior history of domestic violence—the court merely stated, "there is none," which was

19                                                                    A-3884-22

undisputed, but a prior history of domestic violence is but one factor to be considered under N.J.S.A. 2C:25-29(a)(1)-(6) and, as we have previously stated, a single act can constitute domestic violence for the purpose of the issuance of an FRO.  See McGowan, 391 N.J. Super. at 506.

The court then briefly considered factor two—the existence of immediate danger to plaintiff—and found "no evidence of immediate danger, at this time."  We are persuaded that in assessing whether plaintiff was in immediate danger, the court failed to appreciate the depravity of defendant's conduct on the day of the assault, the brutality he exhibited and the length of the assault—approximately five hours—his threats to kill her, and that he perpetrated this assault upon plaintiff in her home, thus, knowing where she lived.

We are similarly persuaded that the court failed to properly consider factor four—the best interest of the victim.  In addressing the best interest factor, the court simply stated, "I see no reason why [plaintiff] would need to continue to have any contact with defendant."  The court, however, did not specifically address whether the grant of an FRO would be in plaintiff's best interest despite having found her testimony credible and the assault perpetrated by defendant egregious acts of domestic violence.  Thus, the court erred in

20

failing to consider the best interest of plaintiff and to properly apply the relevant statutory factors.

Applying our reasoning in <u>A.M.C.</u>, <u>McGowan</u>, and <u>C.C.</u> concerning the need for an FRO in cases with no or a limited history of domestic violence and the seriousness of a single act of domestic violence, we conclude plaintiff has demonstrated a need for protection based on the brutality of the assault she endured, defendant's threats to kill her, defendant's knowledge of where plaintiff lived with her minor children, and his admitted use of marijuana and alcohol to get high. In view of these facts, the denial of the FRO constitutes reversible error because of the egregious nature of this single act and because plaintiff had established the need for a FRO to protect her from immediate danger or to prevent further abuse.

In sum, given our standard of review and having considered the court's factual findings and legal conclusions in its April 24, 2023 order denying the FRO and July 28, 2023 order denying plaintiff's motion for reconsideration, we are persuaded that reversal is warranted. And, we instruct the judge to expeditiously enter a FRO in plaintiff's favor against defendant. Our stay of the April 24, 2023 order shall be vacated upon the remand court's entry of the FRO.

Because we have concluded reversal is warranted under <u>Silver</u>, we need not reach any of plaintiff's remaining arguments.

Reversed and remanded for proceedings consistent with the opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION